*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

1625 E GRAND BLVD INC,

　　　　Plaintiff/Counterdefendant-Appellant,

v

RUAA KANO, CATHERINE L. CLAYPOOLE, and SAMUEL R. SIMONETTA, Trustee of the SIMONETTA FAMILY LIVING TRUST,

　　　　Defendants/Counterplaintiffs-
　　　　Appellees,

and

KENRON GROUP LLP and OBI INVESTMENTS LLC,

　　　　Defendants-Appellees.

UNPUBLISHED
April 17, 2026
11:22 AM

No. 370764
Wayne Circuit Court
LC No. 22-004236-CB

Before: GADOLA, C.J., and MURRAY and M. J. KELLY JJ.

PER CURIAM.

In this quiet title action, plaintiff/counterdefendant, 1625 E Grand Blvd, Inc. (appellant), appeals as of right the stipulated order regarding motions for summary disposition and a judgment to quiet title. The trial court denied in part and granted in part summary disposition under MCR 2.116(C)(10) to defendant/counterplaintiff, Ruaa Kano, and quieted title to property located at 6437 East Palmer, Detroit, Michigan 48211 ("the subject property"), in Kano. The trial court also denied appellant's motion for summary disposition and quieted title to property located at 1625 East Grand Boulevard, Detroit, Michigan 48211 ("the neighboring property"), in appellant, and ordered that the neighboring property was subject to an access easement for the benefit of the subject property. The trial court granted summary disposition under MCR 2.116(C)(10) to defendant, OBI Investments, LLC. We affirm.

-1-

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter involves an ownership dispute between appellant and Kano over the subject property. The subject property, also known as "Parcel 2," has a tax identification number of 15000579.[1] The neighboring property has a tax identification number of 15000591 and is also known as "Parcel 1."[2] Appellant and Kano assert that they obtained the subject property through a chain of title stemming from Antonio B. Simonetta. The Simonetta Family Living Trust was established on April 11, 1994, and Antonio Simonetta was its initial trustee. On August 1, 1996, Antonio Simonetta purchased the subject property and the neighboring property for $25,000 through a warranty deed ("the 1996 deed"), which was recorded in Wayne County in August 1997. The 1996 deed contained the following descriptions:

Parcel 1:

Lots 24, 25, 26 and the East 9.20 feet of Lot 27 and the vacated alley to the rear thereof and vacated Beaufait of "McCormick's Subdivision", of part of Outlot 38, "Maldrum Farms", according to the plat thereof as recorded in Liber 19, Page 50 of Plats, Wayne County Records, excepting therefrom the Northerly 50.00 feet of vacated feet of vacated Beaufait.

Tax Item No. 591, Ward 15

Parcel 2:

A parcel of land located East of Mt. Elliot Avenue, between East Grand Boulevard and Palmer Avenue, in the City of Detroit, Wayne County, Michigan, being part of Outlot 27, "Meldrum Farms", part of Private Claim 18, Town 1 South, Range 12 East, and part of Lot A, together with part of vacated public alley and part of Beaufait Avenue adjoining, of "McCormick's Subdivision", of part of Outlot 38 of "Meldrum Farms", as recorded in Liber 19, Page 50 of Plats, Wayne County Records, and more particularly described as follows: Commencing at the intersetion [sic] of the East line of Mt. Elliot Avenue, 66 feet wide, and the North line of Palmer Avenue, 60 feet wide; thence North 64 degrees East along said North line of Palmer Avenue, 659.61 feet to the point of beginning; thence North 26 degrees West, 180.25 feet to a point in the centerline of a vacated public alley, 20 feet wide; thence North 64 degrees East along said centerline, and the line extended 63.70 feet to a point on the East line of said "McCormick's Subdivision", (Liber

---

[1] The legal description of the subject property is: "N PALMER E 63.72 FT OL 37 LYG N & ADJ PALMER AVE MELDRUM FARM L41 P87-9 DEEDS, W C R 15/274 E 34.29 FT OF A VAC BEAUFAIT S 10 FT OF VAC ALLEY ADJ MC CORMICKS SUB L19 P50 PLATS, W C R 15/82 11,479 SQ FT."

[2] The legal description of the neighboring property is: "S GRAND BLVD E 24 THRU 26 E 9.20 FT 27 VAC BEAUFAIT ADJ & N 10 FT OF VAC ALLEY ADJ MCCORMICKS SUB L19 P50 PLATS WCR 15/82 128.61 X 150[.]"

19, Page 50), said line being also the East line of "Meldrum Farms", Private Claim 18; thence South 26 degrees East along said line, 180.25 feet to the North line of Palmer Avenue aforesaid; thence South 64 degrees West, 63.70 feet along the North line of Palmer Avenue to the point of beginning.

Re: 1625 East Grand Boulevard

Tax Item No. 579, Ward 15[.]

On August 6, 2012, Antonio Simonetta granted a durable power of attorney to his daughter, defendant/counterplaintiff, Catherine L. Claypoole. Beginning in about spring 2013, Antonio Simonetta became involved with local organizations to develop certain properties, including the neighboring property, into the "Dorothy Hofstra Campus." The organizations included the East Grand Boulevard Community Organization ("EGBCO") and the Greater Woodward Community Development Corporation ("GWCDC"). Rev. Joan C. Ross, the executive director of the GWCDC at the time, spoke to Antonio Simonetta regarding his desire to "donate" the neighboring property. Ross stated that the gift "entailed one building, a building at 1625 East Grand Boulevard, once certain conditions were met." Antonio Simonetta wished to make "that a training building, a school . . . to help people get job skills and learning."

Ross wrote a letter to Antonio Simonetta thanking him for "extending the opportunity for [the GWCDC] to utilize the land and buildings at 1625 East Grand Boulevard." The letter included a proposed draft of a memorandum of understanding ("MOU") that clarified a landlord/tenant relationship between EGBCO and GWCDC. Alethea Belfon, a member of the board of directors and treasurer at the GWCDC, averred that she was familiar with the "entire transaction regarding the gift," including meetings with Antonio Simonetta, Ross, and Elvin Jordan, a project manager at the GWCDC. Belfon maintained that, in 2013, Ross met with Antonio Simonetta about his potential gift of the neighboring property and "the adjacent lots."

Antonio Simonetta wrote a letter responding to Ross to "set forth an understanding concerning the gift of certain property and a building owned by [Antonio Simonetta] and located at 1625 E Grand Blvd" to the GWCDC ("the 2013 letter agreement"). The letter included a partial legal description and the tax identification number of the neighboring property. The gift of the neighboring property was conditioned upon the GWCDC meeting seven requirements, and stated that the neighboring property would be conveyed by a quitclaim deed. Simonetta and Ross signed the 2013 letter agreement on July 24, 2013.

A December 6, 2013 addendum ("the first addendum"), which was signed by Antonio Simonetta and Ross, stated that the terms of the MOU were "set forth" in the 2013 letter agreement regarding the gift of the neighboring property to the GWCDC. The first addendum included five new terms, including that the GWCDC agreed "to provide Simonetta an easement for purposes of ingress and egress to and from the premises at [the subject property] . . . ." The easement was located in "a grassy area that was behind on the back side of" the neighboring property.

That same day a quitclaim deed was executed ("the 2013 deed"), conveying "Parcel 1 and 2," which were fully described in the attached "continuation," from Antonio Simonetta to the GWCDC for $1. The legal description continuation was identical with the 1996 deed, including

both the subject property and the neighboring property. The 2013 deed contained a "Deed Stipulation," which stated: "If improvement of 1625 E. Grand Blvd. has not commenced within eighteen (18) months of the date of this Addendum, said real property shall revert back to Grantor."

In March 2014, a second addendum was signed by Antonio Simonetta and Darlene Williams, the board chair of the GWCDC ("the second addendum"). The second addendum regarded "the gift of real property and a building owned by [Antonio Simonetta] located at 1625 E. Grand Blvd, Detroit, MI," or "parcel ID No. 15000591." The second addendum amended the MOU and the first addendum by clarifying "the term 'Improvements' cited in item (1) of the first Addendum." The improvements included five conditions, which were to be commenced within 18 months of the date of the first addendum. After the second addendum was executed, the 2013 deed was recorded in Wayne County in July 2014.

On November 15, 2016, Claypoole, acting as attorney-in-fact for Antonio Simonetta under the general durable power of attorney agreement, executed a warranty deed conveying the subject property to Antonio Simonetta, trustee of the Simonetta Family Living Trust, "or his successors in trust," for $100 ("the 2016 deed"). The 2016 deed contained the legal description of the subject property, as well as its tax parcel identification number. It stated that the property was commonly known as "6437 E Palmer, Detroit, Michigan."

Antonio Simonetta passed away on October 17, 2017. His son, defendant/counterplaintiff, Samuel Simonetta, became trustee of the Simonetta Family Living Trust. On September 15, 2018, Samuel Simonetta, as trustee, conveyed property described in an attached exhibit to defendant, Kenron Group, LLP, for $11,400 ("the 2018 deed").[3] The 2018 deed contained the legal description of the subject property, as well as its address. The 2018 deed stated that the property described in Exhibit A included "all and singular tenements, hereditaments, appurtenances and easements benefiting the said property[.]" The deed was recorded in Wayne County in September 2018. A property transfer affidavit reflected this conveyance.

Kenron executed a mortgage on September 15, 2018 as mortgagor "in favor of Samuel R. Simonetta, Trustee of the Simonetta Family Living Trust," in the amount of $160,000 regarding four properties, including the subject property, which was labeled as "Parcel IV." The mortgage was recorded in Wayne County in September 2018. That same month a UCC Financing Statement was submitted by Kenron and recorded in Wayne County. The Financing Statement was amended to delete "Parcel 1 and Parcel 4," and the amendment was recorded in February 2019.

According to a September 13, 2018 certificate of trust existence and authority, the Simonetta Family Living Trust agreement remained in effect, and the trust included four parcels,

---

[3] This transaction was described in a purchase agreement. Claypoole did not order a title commitment when the subject property was conveyed to Kenron because she "knew from what [Antonio Simonetta] told [her] that he owned" the subject property. Samuel Simonetta testified that, when the subject property was sold to Kenron, "[t]he intention was for Ken Davis and Ron Butcher of Kenron to maintain the foundry business that [Antonio Simonetta] had owned and keep that business going; and at the same time, take ownership of the other parcels of property that [Antonio Simonetta] owned."

including the subject property. On November 28, 2018, Samuel Simonetta, as trustee of the Simonetta Family Living Trust, assigned "any and all of the assets" of the trust to the "remaining beneficiaries." On February 6, 2019, the mortgage between Kenron and Samuel Simonetta, as trustee of the Simonetta Family Living Trust, was "discharged and released with respect only to the real property described in Exhibit A," which included the subject property. The partial discharge was recorded in Wayne County in February 2019.

On February 12, 2019, Kenron executed a warranty deed ("the first 2019 deed") conveying the subject property and another property located at 1601 East Grand Boulevard, Detroit, Michigan 48211 ("the 1601 property"), to Kano for $30,000. The attached exhibit to the first 2019 deed included a legal description for each property, and listed the respective tax identification numbers and the commonly known addresses. Kano then obtained title insurance on the subject property and the 1601 property. Kano started constructing (1) a building at the 1601 property and (2) a parking lot at the subject property. Kano planned to operate a marijuana business on the properties, applied for licenses from Detroit and the state of Michigan, and did not receive any objections throughout that process. After her purchase, Kano paid property taxes for the subject property until Detroit ceased sending her the bills in 2021.

The GWCDC executed a quitclaim deed on March 8, 2019 conveying the neighboring property to appellant for $1 ("the second 2019 deed"). The property conveyed was described in an attached exhibit, and was "**Commonly Known As: 1625 East Grand Boulevard**[.]" The second 2019 deed was recorded in Wayne County in March 2019. The legal description contained in the exhibit of the second 2019 deed was the same as the 1996 deed and the 2013 deed, and described the subject property and the neighboring property.

Belfon averred that the GWCDC received the 2020 tax bill for the subject property in 2021. On April 26, 2021, appellant's counsel sent a letter to Kano's counsel stating that Kano "does not hold title to the subject property and has recorded a false claim of ownership." On July 2, 2021 Kano and OBI executed a promissory note and a mortgage in the amount of $500,000. Kano was the borrower and OBI was the lender. The mortgage was secured by two properties, described fully in Exhibit A, and commonly known as: "1601 E. Grand Blvd. and 6437 E. Palmer, Detroit, MI," and "Tax Item No. 15000579 and 15000590.002L." The mortgage was recorded in Wayne County in July 2021. Kano needed the funds to construct a medical marijuana grower facility at the 1601 property, and gained conditional approval from Detroit effective August 30, 2019. On March 22, 2022, appellant executed a claim of interest in the subject property and the neighboring property. On June 24, 2022, Kano was released from the July 2, 2021 mortgage with OBI.

Appellant filed an amended complaint, alleging (I) a quiet title claim to the subject property, (II) slander of title, (III) trespass, and (IV) concert of action. Claypoole and Samuel Simonetta, trustee of the Simonetta Family Living Trust, filed counterclaims, alleging (I) rescission of a contract due to a material breach, (II) reformation of a deed due to fraud, (III) reformation of a deed due to mutual mistake of fact, and (IV) reversion of gift. Kano also filed counterclaims, alleging (I) common law slander of title, (II) slander of title, and (III) a quiet title claim, asserting she had full ownership of the subject property. After appellant moved for a default judgment against Kenron for failure to appear in the case, the trial court entered a default judgment against Kenron in the form of "quiet title relief."

The parties eventually moved for summary disposition. OBI moved for summary disposition under MCR 2.116(C)(10), asserting that appellant's claims must be dismissed because there was no genuine issue of material fact that OBI had no ongoing involvement with the subject property. Kano moved for summary disposition under MCR 2.116(C)(10) regarding appellant's claims and Kano's counterclaims. Kano argued that the action was merely one to quiet title, and that equity demanded that the trial court quiet title to the subject property in her favor. Samuel Simonetta and Claypoole each moved for summary disposition under MCR 2.116(C)(4), (C)(7), (C)(8), and (C)(10). Appellant moved for summary disposition under MCR 2.116(C)(8), (C)(9), and (C)(10), asserting that it had full ownership of the subject property.

The trial court granted OBI's motion for summary disposition under MCR 2.116(C)(10), dismissing appellant's claims against it because the mortgage it previously issued to Kano no longer encumbered the subject property and "any quiet title action against" the company was moot. Regarding the slander of title claim, the trial court determined that appellant "failed to show any evidence showing OBI filed its lien knowing of its invalidity," emphasizing that Kano "held a warranty deed and the city's approval to begin construction," and appellant never objected to Kano's ownership during the approval process, such that OBI Investments "had no way of knowing of [appellant's] potential claim to title." The trial court determined the trespass and concert of action claims against OBI "have no basis" and "are speculative," dismissing OBI from the action.

The trial court addressed the subject property, and quieted title to the subject property in Kano. The trial court noted that the 2013 deed contained the same language as the 1996 deed, but "included a stipulation and referenced the first addendum." The trial court continued:

> The 2013 quitclaim deed's inclusion of the 6430 [sic] property is inconsistent with the MOU and addendum.
>
> One, . . . the 2013 quitclaim deed was recorded on July 15, 2014[,] only after the parties entered into Addendum 2. The parties dispute the purpose of the 2013 quitclaim deed. [Appellant] allege[s] it transferred the 1625 and 6437 property to [the GWCDC] and Defendants allege the inclusion of a lot information for 6437 property was at best a mistake.
>
> In 2016, Claypoole acting as Simonetta's Power of Attorney transferred the 6437 to the Simonetta Living Trust through a warranty deed recorded on November 17, 2016 after the 2013 quitclaim deed was recorded. In 2019 [the GWCDC] transferred its interest to [appellant] through a quitclaim deed.
>
> . . . [T]his [c]ourt is guided by principles of equity. The [c]ourt does find that the 2013 quitclaim deed is limited by and is to be read in conjunction with the language of the [MOU] and the Addendums together with the actions of the parties as to the payment of taxes and the filing of property transfer affidavits.

The trial court dismissed the claims of slander of title brought by appellant and Kano. Addressing appellant's claim of trespass, the trial court stated that appellant "failed to show title and therefore cannot establish a prima facie case for trespass against any party." Regarding concert

of action, the trial court found Kano, Claypoole, and Samuel Simonetta had "no known connections" and dismissed the claim. The trial court denied Claypoole's and Samuel Simonetta's counterclaims, as well as appellant's claims.

After the parties filed their proposed orders for the trial court to enter, as well as objections, the trial court held a hearing. The trial court clarified that its original decision included that the neighboring property had an easement across it maintained by the subject property. The trial court entered the stipulated order reflecting its decision that title to the subject property be quieted in Kano, and that title to the neighboring property be quieted in appellant. The trial court ordered that appellant's title to the neighboring property was subject "to an access easement for ingress and egress for the benefit of contiguous property located at [the subject property]." The trial court also granted OBI's motion for summary disposition, denied appellant's motion, and dismissed its claims. Reconsideration was denied.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

This Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "[A] [d]e-novo review means [this Court] review[s] the legal issue independently, without deference to the lower court." *Bowman v Walker*, 340 Mich App 420, 425; 986 NW2d 419 (2022) (quotation marks and citation omitted). Although appellant moved for summary disposition under MCR 2.116(C)(8), (C)(9), and (C)(10), the trial court did not specify under which subrule it decided appellant's motion for summary disposition. However, because the trial court denied appellant's motion after having considered documentary evidence outside of the pleadings, we will review the motion under the standard of review for a motion under MCR 2.116(C)(10). *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012).

A motion for summary disposition under MCR 2.116(C)(10) "tests the *factual sufficiency* of a claim." *El-Khalil*, 504 Mich at 160.

> When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id*. (quotation marks and citations omitted).]

"The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion." *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). "If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, whether summary disposition is proper is a question of law for the Court." *Miller Estate v Angels' Place, Inc*, 334 Mich App 325, 330; 964 NW2d 839 (2020).

The trial court held that appellant owned the neighboring property "subject to the access easement to [the subject property]," while Kano owned the subject property. "An action to quiet

title is an equitable action that we also review de novo." *Beach v Lima Twp*, 489 Mich 99, 106; 802 NW2d 1 (2011). "A deed is a contract, and the proper interpretation of the language in a deed is therefore reviewed de novo on appeal." *In re Rudell Estate*, 286 Mich App 391, 402-403; 780 NW2d 884 (2009) (citations omitted). "Statutory interpretation is a question of law, which this Court also reviews de novo." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 493; 791 NW2d 853 (2010).

## B. QUIET TITLE

Appellant argues that title to the subject property must be quieted in it because its chain of title included the 2013 deed, which conveyed the subject property.

"A suit to quiet title or remove a cloud on a title is one in equity." *McFerren v B & B Inv Group*, 253 Mich App 517, 522; 655 NW2d 779 (2002); see also MCL 600.2932(5). "In a quiet-title action, the plaintiff has the initial burden of establishing a prima facie case of title. . . . If the plaintiff establishes a prima facie case of title, the burden shifts to the defendant to prove superior right or title." *1373 Moulin, LLC v Wolf*, 341 Mich App 652, 664-665; 992 NW2d 314 (2022) (quotation marks and citations omitted). Further, "[a] court acting in equity looks at the whole situation and grants or withholds relief as good conscience dictates." *McFerren*, 253 Mich App at 522 (quotation marks and citations omitted). "If the plaintiff established his title to the lands, the defendant shall be ordered to release to the plaintiff all claims thereto." MCL 600.2932(3).

"Michigan is a race-notice state, and owners of interests in land can protect their interests by properly recording those interests. Under MCL 565.29, the holder of a real estate interest who first records his or her interest generally has priority over subsequent purchasers." *Coventry Parkhomes Condo Ass'n v Federal Nat'l Mtg Ass'n*, 298 Mich App 252, 256; 827 NW2d 379 (2012) (quotation marks and citations omitted). MCL 565.29 provides:

> Every conveyance of real estate within the state hereafter made, which shall not be recorded as provided in this chapter, shall be void as against any subsequent purchaser in good faith and for a valuable consideration, of the same real estate or any portion thereof, whose conveyance shall be first duly recorded. The fact that such first recorded conveyance is in the form or contains the terms of a deed of quit-claim and release shall not affect the question of good faith of such subsequent purchaser, or be of itself notice to him of any unrecorded conveyance of the same real estate or any part thereof.

"An inquiry into the scope of the interest conferred by a deed such as that at issue here necessarily focuses on the deed's plain language[.]" *Mich Dep't of Natural Resources v Carmody-Lahti Real Estate, Inc*, 472 Mich 359, 370; 699 NW2d 272 (2005). The following principles guide a court's inquiry:

> (1) In construing a deed of conveyance[,] the first and fundamental inquiry must be the intent of the parties as expressed in the language thereof; (2) in arriving at the intent of parties as expressed in the instrument, consideration must be given to the whole [of the deed] and to each and every part of it; (3) no language in the instrument may be needlessly rejected as meaningless, but, if possible, all the

language of a deed must be harmonized and construed so as to make all of it meaningful; (4) the only purpose of rules of construction of conveyances is to enable the court to reach the probable intent of the parties when it is not otherwise ascertainable. [*Id*. (quotation marks, citation, and footnote omitted; alteration in original).]

The objective of deed interpretation "is to give effect to the parties' intent as manifested in the language of the instrument," and an instrument's "granting clauses are a natural starting point for discerning the parties' intent." *Id*. at 370-371.

"Deeds transfer the ownership interests in real property." *Galvan v Poon*, 511 Mich 206, 211; 999 NW2d 351 (2023). "A quitclaim deed is, by definition, [a] deed that conveys a grantor's *complete interest or claim in certain real property* but that neither warrants nor professes that the title is valid." *Mich Dep't of Natural Resources*, 472 Mich at 377-378 (quotation marks and citation omitted; alteration in original). Warranty deeds are governed by MCL 565.151, which states:

That any conveyance of lands worded in substance as follows: "A.B. conveys and warrants to C.D. (here describe the premises) for the sum of (here insert the consideration)," the said conveyance being dated and duly signed, sealed and acknowledged by the grantor, shall be deemed and held to be a conveyance in fee simple to the grantee, his heirs and assigns, with covenant from the grantor for himself and his heirs and personal representatives, that he is lawfully seized of the premises, has good right to convey the same, and guarantees the quiet possession thereof; that the same are free from all incumbrances, and that he will warrant and defend the title to the same against all lawful claims.

"It may be stated generally that the three elements necessary to constitute a valid gift are these: (1) that the donor must possess the intent to pass gratuitously title to the donee; (2) that actual or constructive delivery be made; and (3) that the donee accept the gift." *In re Rudell Estate*, 286 Mich App at 404 (quotation marks and citation omitted).

"As with any instrument, a deed must be read as a whole in order to ascertain the grantor's intent." *Id.* at 409 (quotation marks and citation omitted). "Parol evidence is not admissible to vary or contradict the legal effect of a conveyance." *Millard v Millard*, 212 Mich 662, 665; 180 NW 429 (1920). However, if a contract is ambiguous, then "extrinsic evidence is admissible to determine the actual intent of the parties." *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010) (quotation marks and citation omitted). "An ambiguity may either be patent or latent. This Court has held that extrinsic evidence may not be used to identify a patent ambiguity because a patent ambiguity appears from the face of the document. However, extrinsic evidence may be used to show that a latent ambiguity exists." *Id*.

Further, there are "many exceptions to the parol evidence rule," including, for example, "that parol evidence may be admitted to prove that a written conveyance absolute in its terms was intended by the parties to operate only as a mortgage." *Ferd L Alpert Indus, Inc v Oakland Metal Stamping Co*, 379 Mich 272, 276; 150 NW2d 765 (1967). Although parol evidence is typically inadmissible to add or contradict the terms of a quitclaim deed, "it has long been established that

this general rule does not apply to the recital of consideration in a deed." *In re Rudell Estate*, 286 Mich App at 410.

Appellant and Kano dispute whether the subject property was included in the 2013 deed and the extent to which parol evidence may be weighed to explain the parties' intent. On de novo review, and considering the evidence in the light most favorable to appellant, we conclude that the 2013 deed did not convey the subject property to the GWCDC.

The 2013 deed did not contain an ambiguity. Rather, the plain language of that deed included "Parcel 1 and 2," or the subject property and the neighboring property. The "Legal Description Continuation" described both properties, reflecting the language used in the 1996 deed. Parol evidence cannot be viewed to contradict the fact that the 2013 deed included language involving both properties. See *Millard*, 212 Mich at 665. It is also undisputed that Antonio Simonetta intended that the neighboring property be a gift to the GWCDC, and that property was included in the 2013 deed.

Crucially, however, that deed included the following stipulation: "If improvement of 1625 E. Grand Blvd. has not commenced within eighteen (18) months of the date of this Addendum, said real property shall revert back to Grantor." Because the 2013 deed expressly references the first addendum, which was executed on the same date, that document must also be considered to interpret the legal effect of the 2013 deed. See *Thiel v Goyings*, 504 Mich 484, 501; 939 NW2d 152 (2019) ("If the words of the covenant are the foundation, the surrounding text is the framing that gives structure and defines inside from outside. Words should not be construed in the void, but should be read together to harmonize the meaning, giving effect to the [agreement] as a whole.") (quotation marks and citation omitted).

As appellant argues, citing to *Wild v Wild*, 266 Mich 570, 576; 254 NW 208 (1934), the first addendum cannot be used to contradict or alter the 2013 deed, see *Millard*, 212 Mich at 665, but "extrinsic evidence may be used to supplement . . . the terms of the written agreement," *Opdyke Inv Co v Norris Grain Co*, 413 Mich 354, 367; 320 NW2d 836 (1982). The plain language of the 2013 deed includes a reference to the neighboring property and indicates that improvement must be commenced within 18 months of "this Addendum[.]" To ignore the first addendum would result in the 2013 deed not being "read as a whole in order to ascertain the grantor's intent." *In re Rudell Estate*, 286 Mich App at 409 (quotation marks and citation omitted). Similar to the Court's enforcement of the unambiguous quitclaim deed in *Wild*, 266 Mich at 576-578, we must enforce the unambiguous language of the 2013 deed, which expressly references the first addendum, see *Bayberry Group, Inc v Crystal Beach Condo Ass'n*, 334 Mich App 385, 393; 964 NW2d 846 (2020) ("If a contract incorporates another document by reference, the two writings should be read together.").

Thus, this Court views the first addendum in conjunction with the 2013 deed. That document, which was signed by Antonio Simonetta and Ross, stated that the terms of the MOU were "set forth" in the 2013 letter agreement regarding the gift of the neighboring property to the GWCDC. Importantly, the first addendum clearly states that the 2013 letter agreement regarded "the gift of real property and a building owned by Antonio B. Simonetta . . . located at 1625 E. Grand Blvd. in Detroit, Michigan, being Parcel ID No. 15000591 to the [GWCDC][.]" The first addendum also references the 2013 letter agreement, which only listed the neighboring property

as being part of the "gift." That agreement also included the tax identification number and partial legal description of only the neighboring property. The first addendum made no mention of the subject property either. It amended the terms as follows:

> 1. *If improvement of 1625 E. Grand Blvd. has not commenced within eighteen (18) months of the date of this Addendum, said real property shall revert back to Simonetta as the previous owner*;
>
> * * *
>
> 5. *The terms of this Addendum and the said [MOU] dated July 24, 2013 are the entire agreement between the partiers [sic] hereto.* [Emphasis added.]

A second addendum was also executed by Antonio Simonetta and Williams before the 2013 deed was ever recorded. That addendum only described the neighboring property and clarified various improvements that were to be commenced within 18 months of the date of the first addendum. The 2013 deed was recorded four months after the second addendum was executed.[4]

Because the parties only intended to convey the neighboring property in the 2013 deed, the subject property was never conveyed to the GWCDC. Rather, the subject property was later conveyed by Claypoole to Antonio Simonetta, trustee of the Simonetta Family Living Trust, "or his successors in trust," through the 2016 deed. That deed was recorded on November 17, 2016. Then, Samuel Simonetta as trustee of the Simonetta Family Living Trust, conveyed the subject property to Kenron for $11,400 through the 2018 deed, which was recorded on September 20, 2018. The conveyance was reflected in a property transfer affidavit and a purchase agreement. On November 28, 2018, Samuel Simonetta assigned "any and all of the assets" of the trust to the "remaining beneficiaries." On February 6, 2019, the mortgage between Kenron and Samuel Simonetta, as trustee of the Simonetta Family Living Trust, was "discharged and released with respect only to the real property described in Exhibit A," which included the subject property.

Ultimately, there is no genuine issue of material fact that (1) the 2013 deed did not convey the subject property to GWCDC, and (2) title to the subject property was transferred from Simonetta to Kano, and thus title to the subject property must be quieted in Kano. And contrary to appellant's assertion on appeal, the parties involved in the 2016 deed, the 2018 deed, and the

---

[4] While not dispositive, Antonio Simonetta, or a family member in the Simonetta Family Living Trust, paid property taxes for the subject property after the 2013 deed was executed. In July 2015, Bruce Cann, president of the GWCDC's board of directors, updated the Simonetta family that the GWCDC was working diligently toward completing the necessary improvements to the neighboring property, in response to an inquiry by Tina Simonetta Samuels, a daughter of Antonio Simonetta. Belfon noted that members of the Simonetta family met with the GWCDC on July 20, 2015 and were "satisfied with our progress and that we had met the conditions of the gift." During that site visit, Claypoole stated that she did not visit the subject property because "it was not a part of the gift."

first 2019 deed could not have had constructive knowledge that the GWCDC owned the subject property because it was not conveyed in the 2013 deed.

## C. ACCESS EASEMENT

Appellant also argues that, because title to the subject property must be quieted in it, there cannot be a permanent easement over the neighboring property and, in any event, any easement was personal to Antonio Simonetta.

> An easement is the right to use the land of another for a specified purpose. [A]n easement may be created by express grant, by reservation or exception, or by covenant or agreement. Michigan courts recognize two types of easements: easements appurtenant and easements in gross. *An appurtenant easement attaches to the land and is incapable of existence apart from the land to which it is annexed.* An easement in gross is one benefiting a particular person and not a particular piece of land. *Michigan law favors easements appurtenant over easements in gross*, and an easement will never be presumed to be a mere personal right where it can fairly be construed to be appurtenant to some other estate. In other words, *if the easement in question relates in some way to a particular parcel of property, it is nearly always deemed appurtenant.* [*Penrose v McCullough*, 308 Mich App 145, 148; 862 NW2d 674 (2014) (quotation marks and citation omitted; emphases added).]

The first addendum, which was referenced by the 2013 deed, contained the following clause:

> 4. GWCDC agrees to provide Simonetta *an easement for purposes of ingress and egress to and from the premises at [the subject property], an easement which shall retained [sic] by Simonetta and not deeded or transferred to GWCDC, solely for such purposes.* GWCDC shall also have access to the premises at [the neighboring property], notwithstanding such easement. [Emphasis added.]

Appellant's primary argument that there cannot be an easement because it owns both the subject property and the neighboring property is meritless because, as explained, the subject property was not included in the 2013 deed and Kano holds title to the subject property. Appellant's other argument, that the easement was personal to Antonio Simonetta and not connected to the property, is unpersuasive. The easement specifically stated that its purpose was for "ingress and egress to and from the" subject property. That language related to the subject property and, because "Michigan law favors easements appurtenant," the easement was attached to the land and not merely Antonio Simonetta personally. See *Penrose*, 308 Mich App at 148.

## D. SLANDER OF TITLE

Appellant contends the trial court erred by granting OBI's motion for summary disposition, which dismissed its claim of slander of title.

Appellant's claim was brought under the common law and statute. "A common-law slander of title claimant must show falsity, malice, and [pecuniary damages or] special damages, i.e., that the defendant maliciously published false statements that disparaged a plaintiff's right in

property, causing special damages.*" Wells Fargo Bank v Country Place Condo Ass'n*, 304 Mich App 582, 595; 848 NW2d 425 (2014) (quotation marks and citation omitted; alteration in original). MCL 565.108 states:

> A person shall not use the privilege of recording notices under this act for the purpose of slandering the title to land. In any action brought for the purpose of quieting title to land, if the court finds that any person has filed a claim solely for the purpose of slandering the title to land, the court shall award the plaintiff all the costs of the action, including attorney fees as the court may allow, and in addition, the court shall order the defendant asserting the claim to pay to the plaintiff all damages that the plaintiff may have sustained as the result of the recording of the notice of claim.

"The same three elements are required in slander of title actions brought under MCL 565.108." *Wells Fargo Bank*, 304 Mich App at 595 (quotation marks and citation omitted). "[T]he crucial element is malice." *Id*. at 596 (quotation marks and citation omitted; alteration in original).

> A slander of title claimant must show some act of express malice, which implies a desire or intention to injure. Malice may not be inferred merely from the filing of an invalid lien; the plaintiff must show that the defendant knowingly filed an invalid lien with the intent to cause the plaintiff injury. A plaintiff may not maintain a slander of title claim if the defendant's claim under the mortgage [or lien] was asserted in good faith upon probable cause or was prompted by a reasonable belief that [the defendant] had rights in the real estate . . . . [*Id*. (quotation marks and citations omitted; alterations in original).]

Even assuming appellant had ownership rights to the subject property, which it did not, there is no genuine issue of material fact that OBI (or Kano) acted maliciously when executing the July 2, 2021 mortgage.

The record included an affidavit of OBI's president, John Orow, who averred that he "checked the Wayne County Register of Deeds records to confirm that the borrower (Defendant KANO) owned the properties and that there were no outstanding liens on the properties." Upon confirmation that Kano "had title to the properties and that there were no outstanding liens," Orow "was satisfied with Defendant KANO's interest in the property," noting that Kano also "had obtained a Marijuana Use license from the City and State and that part of their process was to confirm ownership of the properties." Orow did not know about appellant's claim of interest in the subject property until 10 months after the July 2, 2021 mortgage was executed. Appellant did not introduce any evidence suggesting that OBI acted with malice, and cannot establish a genuine issue of material fact that OBI "filed an invalid lien with the intent to cause the plaintiff injury." *Wells Fargo Bank*, 304 Mich App at 596 (quotation marks and citation omitted). Even if the lien was invalid, malice "may not be inferred merely from the filing on an invalid lien[.]" *Id*. (quotation marks and citation omitted). Summary disposition in favor of OBI was appropriate regarding the slander of title claim.

## E. TRESPASS

Appellant contends that if this Court reverses the trial court's decision regarding the quiet title claim, its ruling as to the claim of trespass must also be reversed.

A trespass involves "an invasion of the plaintiff's interest in the exclusive possession of his land[.]" *Terlecki v Stewart*, 278 Mich App 644, 653-654; 754 NW2d 899 (2008) (quotation marks and citation omitted). "In Michigan, recovery for trespass to land is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession. Moreover, the intrusion must be intentional." *Id*. at 654 (quotation marks and citations omitted). Because title to the subject property was properly quieted in Kano, appellant cannot establish that any of the elements of trespass exist, and there is no genuine issue of material fact that Kano did not trespass on her own property.

Affirmed.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Michael J. Kelly